**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Solomon Flores,<br>1617 Kapiolani Blvd. #606<br>Honolulu, HI 96814<br><br>   *Petitioner,*<br><br>vs.<br><br>The Honorable Kristi Noem,<br>   Secretary of Homeland Security,<br>Washington, DC 20528<br><br>and<br><br>United States of America<br><br>   *Respondents.* | Case No.:<br><br><br>PETITION FOR DECLARATORY<br>JUDGMENT |

## PETITION FOR DECLARATORY JUDGMENT

Petitioner, Solomon Flores, was unlawfully convicted and sentenced at a general court-martial. He requests that this court declare his conviction and sentence unconstitutional, and reverse, overturn, and vacate his conviction and sentence.

## I. JURISDICTION AND VENUE

1) This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal jurisdiction question) and 1346(a)(2) (civil action against the United States…founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department….). *Hathaway v. Secretary of the Army*, 641 F.2d 1376, 1379-80 (9th Cir. 1981).

2) Under 28 U.S.C. § 2201(a), "[i]n a case of actual controversy within its jurisdiction, any court of the United States…may declare the rights and other legal relationships of any interested party seeking such declaration, whether or not further relief is or could be sought."

3) A judgment declaring Petitioner's conviction was unconstitutionally obtained and/or affirmed, and therefore null and void, is an appropriate action to remedy the violations of his constitutional rights. *Davis v. Marsh*, 876 F.2d 1446 (9th Cir. 1989); *see Hatheway*, 641 F.2d 1376. Furthermore, the District Courts, unlike the Court of Claims, have authority to grant equitable relief, such as declaratory judgment, even when the lawsuit involves claims for money over $10,000. *Poole v. Rourke*, 779 F. Supp. 1546, 1556-57 (E.D. Ca. 1991). A claim for backpay as a result of reinstatement due to overturning an unlawful conviction is not a claim for monetary "damages;" instead, it is a claim for something [the Petitioner] was entitled to receive" but for the unlawful conviction. *Id*. at 1556.

4) Venue in this district is proper pursuant to §§ 1391(e) and 1402(a) because of the Respondent's work address stated in the caption and no real property is involved in the action.

## II. THE PARTIES

5) Petitioner was a Culinary Specialist in the United States Coast Guard. He was convicted at Alameda, CA. He currently lives at the above-stated address in Hawaii.

6) Petitioner was convicted, contrary to his pleas, by general court-martial of abusive sexual contact and obstruction of justice, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 934 (hereinafter "UCMJ").[1] He was sentenced to 10 months of confinement, reduction to E-1, and a dishonorable discharge. The convening authority approved the adjudged sentence. Petitioner's confinement has been served and his dishonorable discharge executed.

7) Respondent Noem acts on behalf of the United States of America in her official

---

[1] Petitioner's first court-martial ended in a mistrial. *United States v. Flores*, 80 M.J. 501 (C.G. Ct. Crim. App. 2020).

2

capacity as the Secretary of Homeland Security.  Respondent United States of America is an indispensable party with legal interests adverse to Petitioner's.

### III. STATEMENT OF FACTS

8) The alleged victim, Seaman (SN) MW, was a mess cook aboard Coast Guard Cutter (CGC) SHERMAN.  Petitioner was in charge of the galley when SN MW was mess cooking. On July 26, 2017, the night of the sexual encounter, CGC SHERMAN anchored in Nome, Alaska, for a port visit.  SN MW booked her own hotel room at the Nome Nugget; she planned to join shipmates for "a night of fun" because it had been a long, rough patrol for her.  Everyone who went shoreside for liberty was required to have a "liberty buddy."  However, SN MW's intended "liberty buddy" informed her that he could not come ashore.  SN MW approached Petitioner about the issue, and he then offered to be her liberty buddy for the night.

9) While sitting at the bar in the Nome Nugget drinking alcohol with Petitioner, SN MW overheard him receive a call from another chief petty officer regarding a SHERMAN crew member who was too drunk to return to the boat.  Petitioner asked SN MW if she would give her hotel room to the drunk crew member, and offered for her to stay with him in his room.  SN MW agreed to give up her room, retrieved her belongings, and walked to the pier with Petitioner.  She subsequently returned to the Nome Nugget with Petitioner, the other chief petty officer, and the intoxicated crew member to place the drunk crew member in her former room.  SN MW and Petitioner subsequently went to Petitioner's hotel room at the Aurora.

10) While in Petitioner's hotel room, before leaving again for a night at the bars, SN MW and her boyfriend, SN JB, spoke on the phone while Petitioner was in the shower.  SN JB told SN MW not to spend the night with Petitioner, and instead told her to stay with his friend, SN AF, who had a hotel room at the Nome Nugget.  SN MW agreed "that [SN JB] would figure

something out for me, and that I shouldn't stay there." Nevertheless, SN MW stayed in Petitioner's hotel room. Petitioner and SN MW drank some wine together in his room, then left his hotel and frequented several bars in Nome. While they were out bar-hopping, SN MW called SN AF around midnight. SN AF informed SN MW he was back at his hotel room and would leave the door to his hotel room open for her. SN MW did not remember this phone call. SN AF testified that when he talked to SN MW, she "sounded fine."

11) Instead of going to SN AF's room, SN MW chose to stay with Petitioner and continue drinking. SN MW experienced a blackout from drinking alcohol between the time she bar-hopped with Petitioner and the time they were in his room. She claimed when she "came to," Petitioner was performing oral sex on her. SN MW did not remember anything between leaving the last bar and "coming to" in Petitioner's hotel room. She admitted that when she told Petitioner to "stop," he did.

12) SN MW's exact testimony at trial was as follows:

Q. You have no memory of what happened between leaving the last bar and ending up in [Petitioner's] bed?

A. No, I do not.

Q. Your next memory is [Petitioner's] head between your legs?

A. Correct.

Q. And once you start remembering or once you—the point at which you remember, [Petitioner] is performing oral sex on you.

A. Yes.

Q. And you told [Petitioner] to stop.

A. Yes.

Q. And he stopped.

4

A. Yes.

13) SN MW further testified:

Q. [B]ut it is possible that you voluntarily walked back to [Petitioner's] hotel room?

A. I'm—yes, yes.

Q. It is possible that you chose to walk into [Petitioner's] hotel room?

A. Well, my stuff was in there, so it would make sense.

Q. It is possible that you took off your own pants?

A. Yes.

Q. It is possible that you took off your own underwear?

A. Yes.

Q. It is possible that you got into that bed, because you wanted to?

A. I wanted to is kind of loose, but, yes.

Q. And it is possible that [Petitioner] put his head between your legs because you wanted him to?

A. Sure, yes.

Q. And it is possible that [Petitioner] put his mouth on your vulva, because you asked him to.

A. It's possible.

14) When SN MW realized she was in bed with Petitioner with his mouth on her vulva, she started to think about her boyfriend. She had disobeyed her boyfriend's instruction to not spend the night with Petitioner. She was also disappointed in herself for being the kind of person who cheats on her boyfriend. SN MW acknowledged that when she drinks alcohol, she becomes "loose" and "flirty," and her inhibitions are lowered. She also acknowledged she may have flirted with Petitioner before ending up in bed with him. SN MW left Petitioner's room at the

5

Aurora and walked back to SN AF's room at the Nome Nugget, about one-half mile away. She

arrived around 0300. She appeared "fine" to SN AF, and was able to walk and navigate around

his room. While SN AF smelled alcohol on SN MW's breath, she did not knock anything over

or run into any walls.

15) Three different Coast Guard Investigative Service (CGIS) agents interviewed SN

MW between March 9-April 18, 2018. She made no allegations about Petitioner during the first

two interviews. She also had not told her boyfriend, SN JB, about sleeping in Petitioner's bed or

their sexual encounter. It was only the day *after* CGIS interviewed SN JB, when he began to

suspect SN MW spent the night with Petitioner in Nome, that she reported Petitioner sexually

assaulted her in Nome. SN MW stated she was worried about disclosing her allegations about

Petitioner because "[o]bviously I had a boyfriend at the time, so I was worried about that."

16) At Petitioner's first court-martial, SN MW admitted her alcohol consumption could

have played a role in whether or not she found CSC Flores attractive that night. She also

admitted alcohol possibly factored into her wanting to stay the night with Peittioner.[2] However,

at Petitioner's second court-martial which is the subject of this petition, SN MW testified she

was not attracted to Petitioner. She also testified she had not told Petitioner she was attracted to

him, despite the military judge's earlier admonition that she could only testify about things she

actually remembered. Petitioner's trial defense counsel failed to cross-examine SN MW on her

sworn testimony from Petitioner's first court-martial.

17) Colonel (COL) MS testified for the defense. He qualified as an expert in forensic

psychiatry, specifically regarding "alcohol and its effect on memory, cognition, and behavior."

---

[2] Petitioner's first court-martial ended in a mistrial that the Government unsuccessfully appealed. *United States v. Flores* (*Flores I*), 80 M.J. 501 (C.G. Ct. Crim. App. 2020).

Alcohol consumption can result in looser inhibitions and doing things one would not normally do when sober. Some people refer to alcohol as "liquid courage." Someone who drinks alcohol to the point of blacking out, that is lacking a memory of certain events, can still make decisions to voluntarily engage in activity like having sex with strangers and having unprotected sex. Some people who find out they engaged in certain activities they do not remember get scared such that they do not drink alcohol again, while others "know that's how their body reacts to alcohol." People who black out from alcohol consumption are not "cognitively impaired" beyond blacking out, as they can still do things and make decisions.

18) In COL MS's opinion, SN MW was not "passed out" or "unconscious" or "asleep" because she described herself as "sobering up" before leaving Petitioner's hotel room. COL MS also testified that SN MW's claim of being "sexually assaulted" could be consistent with her trying to avoid accountability for her behavior while drunk. SN MW's claim of being blacked out could also be consistent with a desire to avoid accountability for disobeying her boyfriend's instruction to not stay with Petitioner in his room.

19) Major (MAJ) JC testified as an expert for the Government in "counter-intuitive" behavior regarding delayed reporting. The defense objected and briefed its argument, noting that SN MW was able to explain why she delayed reporting her "sexual assault" to CGIS—that she was not ready to discuss it until her third interview. Trial counsel subsequently expanded MAJ JC's anticipated testimony to include "clusters of symptoms" experienced as a result of "sexual trauma." During his proffer, MAJ JC testified about four general "clusters" of symptoms consistent with "sexual trauma." MAJ JC acknowledged these "responses to trauma" could be subject to differing interpretations because the symptoms were non-specific.

20) The military judge allowed MAJ JC to testify along these lines, referencing a

"clinical study" he was going to testify to. She subsequently clarified that MAJ JC could testify how the clinical research applied to SN MW's testimony and whether her "symptoms" were "consistent" with sexual trauma; however, "bolstering or affirming the meaning of a specific act, not permitted."

21) MAJ JC ultimately testified that "sexual trauma" is a subjective concept wherein an individual may interpret a sexual encounter as a "distressing" event leading to experiencing symptoms of post-traumatic stress disorder (PTSD). There are generally four "clusters" of symptoms of "sexual trauma:" (1) avoidance; (2) negative mood, like depression and irritability; (3) intrusive thoughts; and (4) exaggerated startle response. The military judge interrupted MAJ JC's testimony when trial counsel asked whether he observed "intrusive thoughts" in SN MW, because such testimony was "bolstering." The military judge went on to "clarify" that while she was allowing trial counsel to present evidence that SN M.W.'s statements were "consistent" with the "clusters," she would not allow MAJ JC to testify about any of the "indicators" within the "clusters." She allowed trial counsel to inquire into the clusters of behaviors without affirming that someone's testimony was consistent." Trial counsel then asked, "So my understanding is, we will testify as to the clusters as a science, and then not confirm that those clusters are consistent with the witnesses?" The military judge confirmed that understanding was correct.

22) MAJ JC then testified that, based on SN MW's testimony, and his review of materials, including her prior testimony, he observed indicators of "intrusive thoughts" in SN MW. He went on to testify that he observed other symptoms of "trauma" in her. Finally, he testified that alcohol and sexual assault "go hand in hand." "The statistics are, but I believe it's over 60 percent of cases, there's coexisting elements where alcohol is involved."

23) The defense moved the military judge for a specific instruction regarding the

definition of "consent" based on the CGCCA's decision in *United States v. Weiser*, 80 M.J. 635, 639 (C.G. Ct. Crim. App. 2020). The defense-requested instruction included language stating "[w]hether or not SN MW was competent, and therefore capable of consenting . . . based on her level of intoxication is not before you." However, the military judge refused to include this sentence in the final instructions. Despite promising to explain her decisions on the record, the military judge failed to explain why she refused to include this particular sentence in the instruction.

24) The military judge instructed the panel members that only a "competent" person can consent, an "incompetent" person is one who is "impaired" by alcohol, and an "incompetent" person cannot consent. Although the military judge instructed the members that SN MW's intoxication was only relevant to whether she consented to the sexual contact, she did not clarify the level of "impairment" required to render a person "incompetent," nor did she instruct the members on a mistake of fact defense that Petitioner had an honest and reasonable belief SN MW was capable of consenting despite being intoxicated.

25) During closing argument, trial counsel emphasized SN MW's belief that "in her heart of hearts," she did not consent to Petitioner placing his mouth on her vulva. In response to defense counsel's closing argument that consensual sexual activity could continue until there was a "big red stop sign," at which point, Petitioner stopped, trial counsel argued that consent was only valid if "affirmatively" given.

26) On appeal to the United States Coast Guard Court of Criminal Appeals ("CGCCA"), Petitioner advanced eight (8) assignments of error, through counsel or personally. As relevant to this petition, Petitioner asserted: (1) the evidence was factually and/or legally insufficient to support his conviction for abusive sexual contact; (2) a material variance existed between the

9

charged offense—abusive sexual contact without SN MW's consent—and the evidence

presented at trial—that SN MW was "incapacitated" by alcohol, and therefore could not consent;

(3) the military judge erred in instructing the panel to consider SN MW's level of intoxication in

determining whether she was "competent" to consent, as her "competence" was not an issue to

be decided by the Court; (4) trial counsel (prosecutor) committed improper argument by

misstating the law on consent; (5) the military judge erred in allowing Major (MAJ) JC to give

"expert testimony" on "clusters of symptoms" experienced by "victims" of "sexual trauma" and

the "statistics" of sexual assault cases that involve alcohol; and (6) Petitioner's trial defense

counsel were ineffective for failing to cross-examine SN MW about her prior testimony at

Petitioner's previous court-martial, or to otherwise introduce her prior testimony, that alcohol

could have played a role in her finding Petitioner "attractive" as a result of her intoxication, and

could have led to her wanting to stay overnight with him.

27) On August 11, 2022, the CGCCA affirmed Petitioner's convictions and the sentence.
*United States v. Flores* (*Flores II*), 82 M.J. 737 (C.G. Ct. Crim. App. 2022).  Appendix I.

Petitioner filed a petition for the United States Court of Appeals for the Armed Forces (CAAF)

for a review of the decision of the CGCCA.  On June 7, 2023, the CAAF denied review.  *United States v. Flores*, 83 M.J. 383, 2023 CAAF LEXIS 390 (C.A.A.F. Jun. 7, 2023).  Appendix II.

28) Regarding the instructional error, the CGCCA held Petitioner "waived" the error due

to a lack of objection to the military judge's instructions.  *Flores II*, 82 M.J. at 746.  The

Government did not argue error was "waived;" instead, the Government argued the standard of

review was "plain error."

29) On October 7, 2024, the CAAF decided *United States v. Mendoza* (*Mendoza II*), 85

M.J. 213 (C.A.A.F. 2024).  *Mendoza II* involved a highly-intoxicated victim who did not

10

remember the sexual conduct, similar to Petitioner's case.  In *Mendoza II*, the CAAF held that the Government conflated theories of liability in presenting evidence and/or arguing that because of the alleged victim's intoxication, she did not consent because she could not consent.  *Id*. at 220-21.  As in Petitioner's case, the Government in *Mendoza II* charged based only on a theory that the alleged victim *did not* consent; the Government did not charge based on a theory that the alleged victim *could not* consent due to her intoxication.

30) The CAAF held that "without consent" and "incapable of consent" theories of liability are two separate theories that are not interchangeable.  *Id*. at 218; *see also United States v. Sager*, 76 M.J. 158 (C.A.A.F. 2017) (holding that the phrase "sleeping, unconscious, or otherwise unaware" refer to three separate theories of liability).  While an alleged victim's intoxication level can be considered as evidence for both "without consent" and "incapable of consent" theories, the Government cannot prove its case by litigating or arguing that she did not consent because she could not consent, when only a "without consent" theory was charged. *Mendoza II*, 85 M.J. at 222.

31) In *Mendoza II*, the CAAF held that when a CCA considers the alleged victim's "high level of intoxication" without explanation as to how it factored into the court's analysis, there is an "open question" whether the CCA applied correct legal principles in its factual sufficiency analysis.  *Id*.  The CAAF remanded the case to the Army Court of Criminal Appeals for another analysis of legal and factual sufficiency.  *Id*. at 222-23.

32) As Judge Sparks noted in his concurring and dissenting opinion, "without consent" and "incapable of consent" are legally contradictory, not overlapping, theories of liability.  *Id*. at 229-30 (Sparks, J. concurring in part and dissenting in part and in the judgment).  By charging one theory but litigating and arguing another uncharged theory, the Government violated SSG

Mendoza's due process right to fair notice of the theory against which to defend. *Id*. at 224. Alternatively, the evidence was legally insufficient to support SSG Mendoza's conviction. *Id*. Either way, the court was required to set aside and dismiss the finding and sentence, instead of remanding the case for another legal and factual sufficiency review.

33) Petitioner now presents this petition for declaratory judgment.

## IV. <u>SCOPE OF REVIEW—DECLARATORY JUDGMENT</u>

34) "In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

35) "The Government must obey its own laws." *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979). Military departments are not immune from the proscription that they are not at liberty to ignore the law, and that agency actions in contravention of the Constitution, applicable statutes and regulations, are unlawful. *Id*. (citing *Vitarelli v. Seaton*, 359 U.S. 535, 539 (1959)); *Harmon v. Brucker*, 355 U.S. 579, 582 (1958); *Service v. Dulles*, 354 U.S. 363, 379 (1957); *Geiger v. Brown*, 419 F.2d 714, 717-19 (D.C. Cir. 1969); *Roberts v. Vance*, 343 F.2d 236, 240 (D.C. Cir. 1964).

36) "A 'controversy' must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937). A federal court may review a court-martial conviction for constitutional and/or jurisdictional error in a suit for declaratory relief by one not in confinement. *Davis v. Marsh*, 876 F.2d 1446 (9th Cir. 1989); *Homcy v. Resor*, 455 F.2d 1345 (D.C. Cir. 1971).

37) "[T]he deprivation of liberty under an invalid conviction is a grievous injury, but a

dishonorable discharge imposes a lifelong disability of greater consequence for persons un-lawfully convicted by courts-martial." *Kaufmann v. Secretary of the Air Force*, 415 F.2d 991, 995 (D.C. Cir. 1969).

> 38) A court-martial is one of those inferior courts of limited jurisdiction whose judgments may be questioned collaterally. To give effect to its sentences it must appear affirmatively and unequivocally that the court was legally constituted; that it had jurisdiction; that all the statutory regulations governing its proceedings had been complied with, and that its sentence was conformable to law.

*McClaughry v. Deming*, 186 U.S. 49, 63 (1902).

39) The scope of review for declaratory judgment is comparable to habeas corpus scrutiny. *Kauffman*, 415 F.2d at 996-97. The scope of review for habeas corpus scrutiny is "full and fair consideration." *Burns*, 346 U.S. at 144. District courts routinely apply the "full and fair consideration" test in non-habeas corpus collateral attacks because it is less deferential than the "void" standard, and if court-martial proceedings satisfy this standard, they will also necessarily satisfy the "void" standard, the traditional standard for non-habeas corpus collateral attacks. *Bergdahl v. United States*, 683 F. Supp. 3d 24, 48 (D.D.C. 2023); *Scott v. United States*, 351 F. Supp. 3d 1, 7-8 (D.D.C. 2018).

40) Two steps are applied in the "full and fair consideration" standard: (1) reviewing the military court's thoroughness in examining the relevant claims, where thoroughness is contested; and (2) closely looking at the merits of the claim to determine if the consideration was "fair," albeit with some degree of deference and certainly more than under a *de novo* standard. *Sanford*, 586 F.3d at 32. If the consideration fails either the "full" or "fair" prong, this Court proceeds to a full merits review.

41) This two-step process involves examining four questions to determine whether a federal court should decide in favor of a constitutional challenge to a court-martial conviction:

(1) whether the asserted error is of substantial constitutional dimension, or so fundamental as to have resulted in a miscarriage of justice; (2) whether the issue is one of law rather than one of disputed fact already determined by military tribunals; (3) whether military considerations warrant different treatment of constitutional claim(s); and (4) whether the military courts gave adequate consideration to the issues involved and applied proper legal standards. *Calley v. Callaway*, 519 F.2d 184, 199-200, 203 (5th Cir. 1975) (en banc), *cert. denied*, 425 U.S. 911 (1976); *see Monk v. Zelez*, 901 F.2d 885, 888 (10th Cir. 1990)); *Mendrano v. Smith*, 797 F. 2d 1538, 1542 n.6 (10th Cir. 1986).

42) While "federal courts do not sit to retry . . . cases *de novo*, they *do* sit "to review for violation of federal constitutional standards." *Calley*, 519 F.2d at 199-200 (quoting *Milton v. Wainwright*, 407 U.S. 371, 377 (1972)). This is because "the military establishment is not a foreign jurisdiction; it is a specialized one." *Kauffman*, 415 F.2d at 997. The federal court should reverse a conviction "when the alleged error constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" *Calley*, 519 F.2d at 200 (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)).

43) "Decisions by reviewing courts within the military justice system must be given a healthy respect . . . . But a necessary prerequisite is that the military courts apply a proper legal standard to disputed claims." *Calley*, 519 F.2d at 203.

> The constitutional guarantee of due process is meaningful enough, and sufficiently adaptable, to protect soldiers – as well as civilians – from the crude injustices of a trial so conducted that it becomes bent on fixing guilt by dispensing with rudimentary fairness rather than finding truth through adherence to those basic guarantees which have long been recognized and honored by the military courts as well as the civilian courts.

*Burns,* 346 U.S. at 142-43. As such, *Burns* holds that where military courts have manifestly refused to consider a petitioner's claims, federal district courts may review such claims *de novo*.

14

*Id.* at 142.

44) In Petitioner's case, the military courts refused to consider Petitioner's claim that the military judge's instruction that only a competent person can consent, an "incompetent" person is one who is "impaired" by alcohol, and an "incompetent" person cannot consent, without further clarification, was inappropriate, incomplete, and confusing to the members because it allowed them to convict based on an uncharged theory of "incapacitation" because he "waived" the issue by failing to object. *Flores II*, 82 M.J. at 746. The CGCCA recognized it could "pierce" waiver and affirmatively decide the issue, but the CGCCA declined to do so. *Id.* (citing *United States v. Chin*, 75 M.J. 220, 222 (C.A.A.F. 2016)). Under these circumstances, this Court should hold that the military courts "fully and fairly" considered the issues in Counts I-II, and review these two issues *de novo*.

## V. <u>CLAIMS</u>

**A.  Count I: The CGCCA Erred In Applying Waiver To The Military Judge's Instructional Error Regarding Definitions of "Competence" And "Incompetence."**

45) A lack of objection to instructions does not amount to waiver where the instructions are contrary to settled matters of law. *See United States v. Haverty*, 76 M.J. 199, 201 (C.A.A.F. 2017) (finding plain error where military judge failed to instruct on the *mens rea* for offense under Article 92); *United States v. Girouard*, 70 M.J. 5, 12 (C.A.A.F. 2011) (erroneous instruction as to lesser included offense was subject to plain error analysis even though instruction was requested by accused). Additionally, waiver does not apply to required instructions, which includes correct instructions on the elements of the offense. *United States v. Davis*, 53 M.J. 202, 205 (C.A.A.F. 2000).

46) "*Per se* incapacitation due to impairment from alcohol" has been consistently rejected

by military appellate courts for almost two decades, as they have consistently recognized that drunk people, even those who are "blacked out" drunk, are capable of consenting to sex. *United States v. Rogers*, 75 M.J. 270 (C.A.A.F. 2016); *United States v. Solis*, 75 M.J. 759 (N-M Ct. Crim. App. 2016); *United States v. Pease*, 74 M.J. 763 (N-M. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 180 (C.A.A.F. 2016); *United States v. Long*, 73 M.J. 541 (A. Ct. Crim. App. 2014); *United States v. Gilpin*, 2019 CCA Lexis 515 (N-M. Ct. Crim. App. Dec. 30, 2019) (unpub. op.); *United States v. Condon*, 2017 CCA Lexis 187, *45 (A.F. Ct. Crim. App. Mar. 10, 2017) (unpub. op.), *aff'd*, 77 M.J. 244 (C.A.A.F. 2018); *United States v. Newlan*, 2016 CCA Lexis 540 (N-M Ct. Crim. App. Sep. 13, 2016) (unpub. op.); *United States v. Mohead*, 2015 CCA Lexis 465 (N-M Ct. Crim. App. Oct. 29, 2015) (unpub. op.), *pet. denied*, 2016 CAAF Lexis 268 (C.A.A.F. Mar. 10, 2016); *United States v. Bridenstine*, 2015 CCA Lexis 462 (N-M Ct. Crim. App. Oct. 29, 2015) (unpub. op.); *United States v. Collins*, 2011 CCA Lexis 22 (N-M Ct. Crim. App. Feb. 17, 2011) (unpub. op.); *United States v. Lamb*, 2010 CCA Lexis 334 (N-M Ct. Crim. App. Sep. 21, 2010) (unpub. op.); *United States v. Peterson*, 2010 CCA Lexis 336 (N-M Ct. Crim. App. Sep. 21, 2010) (unpub. op.); *United States v. Wood*, 2010 CCA Lexis 24 (N-M Ct. Crim. App. Jan. 25, 2010) (unpub. op.); *United States v. Nicely*, 2007 CCA Lexis 322 (A.F. Ct. Crim. App. Aug. 14, 2007) (unpub. op.).

47) Similarly, the competency of the decision to engage in sexual activity, *i.e.* a "good" or "bad" decision, is not part of the "capacity" analysis. *United States v. Brown*, 2014 CCA Lexis 870, *6 (A. Ct. Crim. App. Nov. 21, 2014) (unpub. op.). Drunk people simply do not make "good" decisions, but they can nevertheless make decisions. *Id.* Therefore, "litigants and military judges who fixate solely on . . . 'impairment' do so at their peril." *Newlan*, 2016 CCA Lexis 540 at *7.

48) In *Pease*, the Navy-Marine Court of Criminal Appeals answered the question of "how impaired does a person have to be before they are incapable of consenting?" 74 M.J. at 770.

> A "competent" person is simply a person who possesses the physical and mental ability to consent. An "incompetent" person is a person who lacks either the mental or physical ability to consent due to a cause enumerated in the statute. To be able to freely give an agreement, a person must first possess the cognitive ability to appreciate the nature of the conduct in question, then possess the mental and physical ability to make and to communicate a decision regarding that conduct to the other person.

> Applying that interpretation to this case, we are not convinced beyond a reasonable doubt that the complainants were incapable of consenting—that is, that they lacked the cognitive ability to appreciate the sexual conduct in question or the physical or mental ability to make and to communicate a decision about whether they agreed to the conduct. Additionally, even if we were to conclude that they were "incapable of consenting," we conclude that under the facts of this case, the Government did not prove beyond a reasonable doubt that the appellant knew or reasonably should have known of this condition.

*Id*. The CAAF affirmed the NMCCA's answer. 75 M.J. at 185-86.

49) The military judge's instruction that an "incompetent" person is one who is "impaired" by alcohol, without providing further clarification according to *Pease*, was contrary to a settled matter of law. Furthermore, it was obvious the military judge determined SN MW's "competence" was an element of "consent," and therefore required an accurate definition. Because the military judge chose to inject the issue of SN MW's "competence," even though the defense specifically requested an instruction that SN MW's "competence" was not an issue before the members, she was also required to provide a *full* instruction on the definition of "competence;" she could not simply state an "incompetent" person is "impaired" by alcohol. *Davis*, 53 M.J. at 205.

50) The military judge's failure to include a full instruction on the definition of "competence" was not subject to "waiver," because the defense counsel sufficiently preserved

17

the issue by requesting a "novel" but common-sense instruction that SN MW's competence was not an issue before the members (because incapacity was not charged as a theory of liability). The military judge denied this request.  Under these circumstances, defense counsel was not required to continue objecting in order to preserve the issue.  *United States v. Killion*, 75 M.J. 209, 214 (C.A.A.F. 2016) (holding that the military judge's demonstration of awareness of defense counsel's specific grounds for the alternative instruction, flat disagreement, and no indication that further objection was likely to be successful sufficiently preserved instructional error for appellate review); *see also United States v. Davis*, 76 M.J. 224, 229 (C.A.A.F. 2017) (instructional error may be preserved by either an objection *or* requesting an instruction in a way that sufficiently signals the existence of an error needing correction).

51) Because the defense sufficiently preserved instructional error for appellate review, the CGCCA was required to review the adequacy of the instruction *de novo*.  *Killion*, 75 M.J. at 214.  Further, the CGCCA was required to test the instructional error for harmlessness beyond a reasonable doubt, for which the Government bore the burden of persuasion.  *Id*. (citations omitted).  Utilizing the appropriate standards of review, including a *de novo* review of the issues, this Court should reverse Petitioner's abusive sexual assault conviction for the CGCCA's error in applying waiver.

**B.  Count II:  The Military Judge's Instruction On "Competence" was Incomplete, Incorrect, And Injected An Uncharged Theory That Petitioner Could Be Convicted Simply Because SN MW Was "Impaired" By Alcohol, Which Violated His Due Process Right To Be Convicted Of Only The Charged Theory.**

52) While panel members are normally presumed to have followed the military judge's instructions, the presumption does not apply when the military judge fails to provide

18

them with correct instructions. *United States v. Holt*, 33 M.J. 400, 408 (C.M.A. 1991); *United States v. Curry*, 38 M.J. 77, 81 (C.M.A. 1993). "Panel members are not lawyers, and [therefore] cannot be presumed to correctly resurrect the law." *Curry*, 38 M.J. at 81. Even a technically correct instruction can be erroneous if it fails to put evidence in its proper context. *United States v. Washington*, 80 M.J. 106, 114 (C.A.A.F. 2020) (Stucky, C.J. dissenting).

53) "Failure to provide correct and complete instructions to the panel before deliberations begin may amount to a denial of due process." *Killion*, 75 M.J. at 213. Here, the military judge's instruction on whether SN MW's impairment by alcohol rendered her "incompetent" misled the members into believing that, because she was "impaired" by alcohol to the point of black-out, she was necessarily "incompetent," could not consent, and therefore did not consent. In other words, based on the military judge's confusing, incomplete, and misleading instruction regarding "incompetence," SN MW's blacked-out drunken state rendered her *per se* incompetent such that she could not have consented. This conflates different, and inconsistent, theories of liability, as occurred in *Mendoza*. 85 M.J. at 222. Conflating theories of liability violates an accused's due process right to know what offense and under what legal theory he will be tried and convicted. *Id*. at 220 (citing *United States v. Riggins*, 75 M.J. 78, 83 (C.A.A.F. 2016)), 224 (Sparks, J. concurring in part and dissenting in part and in the judgment).

**C. Count III:  The Evidence Was Legally And Factually Insufficient to Support Petitioner's Conviction For Abusive Sexual Contact.**

54) The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis added). The test for factual sufficiency is whether, after weighing evidence in the record of trial and

making allowances for not having personally observed the witnesses, the Court is personally convinced of the accused's guilt beyond a reasonable doubt. *Id.* at 325.

55) In weighing factual sufficiency, the Court takes "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt." *United States v. Washington*, 57 M.J. 57 M.J. 394, 399 (C.A.A.F. 2002). "Beyond a reasonable doubt" means that if the record leaves the CCA with a fair and rational hypothesis other than guilt, the CCA is required to set aside the conviction for factually insufficient evidence.

56) The CGCCA did not have the benefit of the CAAF's *Mendoza* decision to consider Petitioner's case. Where it is not clear how an alleged victim's intoxication factored into the conviction or factual sufficiency review, the case should be remanded for another review. *Mendoza*, 85 M.J. at 222. The military judge's inclusion of language that a person "impaired" by alcohol is "incompetent," and an "incompetent person cannot consent," leaves an open question as to whether Petitioner was convicted based on the charged theory that SN MW did not consent, or whether he was convicted based on the uncharged theory that she could not consent due to her "impairment" by alcohol, and therefore did not consent. *Id.* at 221-22. This open question renders Petitioner's abusive sexual contact conviction legally insufficient.

57) Another problem that leaves an open question as to whether Petitioner was convicted based on the charged theory of nonconsent, or the uncharged theory of incapable of consent due to impairment by alcohol, was trial counsel's redirect examination of SN MW. In response to defense counsel's cross-examination wherein SN MW admitted it was possible she voluntarily took off her clothes and wanted Petitioner to put his mouth on her vulva, trial counsel asked her about other "possibilities" that night, such as doing a handstand on a bar or riding horses. Setting aside the fact that defense counsel should have objected, trial counsel's redirect

20

examination focused on SN MW's capabilities while intoxicated, instead of her voluntary actions based on her decision-making. Focusing on her capabilities raised the specter of "incapacity" to make a decision, not whether her actions were voluntary based on her decision-making.

58) Although circumstantial evidence may be sufficient to support a conviction for abusive sexual contact, in Petitioner's case, SN MW's speculation that "in her heart of hearts, she did not consent" is hardly the kind of circumstantial evidence that overcomes reasonable doubt. Like in *Mendoza*, 85 M.J. at 231-32 (Sparks, J. concurring in part and dissenting in part and in the judgment), SN MW's high level of intoxication actually made it *more* likely that she consented. A fair and rational hypothesis other than guilt is that SN MW's inhibitions were lowered such that she flirted with Petitioner, was attracted to him, likely took her own clothes off when they returned to Petitioner's room, and even "wanted" Petitioner to put his mouth on her vulva. Under these circumstances, Petitioner's conviction for abusive sexual contact was factually insufficient. *See Pease*, 74 M.J. at 771 (the purported victim "conceded on cross-examination she may have said yes to the sexual intercourse and just could not remember doing so"); s*ee also United States v. Dorr*, Army 20170172, 2019 CCA LEXIS 229, *8 (A. Ct. Crim. App. 22 May 2019) (unpub. op.) ("Lack of memory, however, does not equate to inability to consent."). When SN MW realized she was cheating on her boyfriend and disobeying his "order" to stay with SN AF, she pushed Petitioner away and told him to stop. Upon being told to stop, *Petitioner stopped*. That SN MW felt bad about the encounter afterward does not prove the contact was an assault; rather it proves a consensual encounter she subsequently regretted.

**D. Count IV: Petitioner's Trial Defense Counsel Were Ineffective For Failing To Cross-Examine SN MW About Her Prior Testimony That She Could Have Found Petitioner Attractive And Wanted To Stay Overnight With Him.**

21

59) SN MW testified at Petitioner's first court-martial that her alcohol consumption could have played a role in whether or not she found Petitioner attractive and factored into her wanting to stay the night with him. Yet, trial defense counsel failed to question SN MW on this point during cross-examination. In affirming Petitioner's conviction for abusive sexual contact as factually sufficient, the CGCCA relied on SN MW's claim that because she was not attracted to Petitioner, she would not have consented to sexual activity with him. *Flores II*, 82 M.J. at 743. Under the circumstances, defense counsel's failure to cross-examine SN MW about her prior testimony, or to separately introduce her prior testimony, as a prior inconsistent statement under oath, should be reviewed for ineffective assistance of counsel.

60) Whether someone suffered from ineffective assistance of counsel is a Sixth Amendment issue. U.S. CONST. AMEND. VI. Claims of ineffective assistance of counsel are reviewed *de novo*. *United States v. Captain*, 75 M.J. 99, 102 (C.A.A.F. 2016). The accused must prove that defense counsel's performance was deficient and that the deficiency caused prejudice. *Id*. at 103 (citing *Strickland v. Washington*, 466 U.S. 668, 698 (1984)). "Prejudice" is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is one that undermines confidence in the outcome. *Id*.

61) Petitioner's defense counsel was deficient in either failing to cross-examine SN MW about her prior testimony that she may have been attracted to Petitioner, or failing to introduce her prior testimony on this point as *substantive* evidence of a prior inconsistent statement under oath under Military Rule of Evidence (MIL. R. EVID.) 801(d)(1)(A). This deficiency prejudiced Petitioner, since SN MW's testimony at his second court-martial that she did not consent *because* she was not attracted to him factored into his conviction and the CGCCA affirming his

conviction. *Flores II*, 82 M.J. at 743.  Confronting SN MW with her prior testimony that she may have been attracted to Petitioner, or otherwise introducing her prior testimony under MIL. R. EVID. 801(d)(1)(A) would have undermined her credibility such that there was a "reasonable probability" Petitioner would have been acquitted of abusive sexual contact.

## VI. PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully prays that this Honorable Court:

1) Declare Petitioner's conviction for abusive sexual contact and sentence unlawful, and reverse, overturn, and/or vacate his general court-martial conviction and sentence.

2) Order Respondents to immediately and forthwith restore all pay, rank, benefits, entitlements, and privileges as have been denied as a result of Petitioner's unlawful conviction and sentence.

3) Order Respondents to immediately and forthwith correct Petitioner's records to reflect the reversal, overturning, and/or vacatur of Petitioner's unlawful conviction and sentence.

4) Award Petitioner costs and attorney's fees.

5) Grant all such other and further relief as this Court deems just and proper.

Respectfully Submitted,


*/s/ Tami L. Mitchell*
Tami L. Mitchell
Law Office of Tami L. Mitchell
5390 Goodview Drive
Colorado Springs, CO 80911
tamimitchelljustice@gmail.com
Tel:  719.426.8967
*Attorney for Petitioner*

September 16, 2025